IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHN DOE and JANE DOE,
as parent and guardian of JULIE DOE,

      Plaintiffs,

             v.

AETNA LIFE INSURANCE COMPANY a/k/a
AETNA HEALTH INCORPORATED,

      Defendant.

Civil Action No.
1:17-cv-01167-SDG

## ORDER

This matter is before the Court on the parties' cross-motions for judgment

on the administrative record. For the reasons set forth below, the Court **GRANTS**

Plaintiffs' Motion for Judgment on the Administrative Record [ECF 49] and

**DENIES** Defendant's motion [ECF 50].

## I.   STANDARD OF REVIEW

The procedural vehicle for resolving motions for judgment based on the

administrative record is Federal Rule of Civil Procedure 52(a)(1), which states:

"[i]n an action tried on the facts without a jury . . . the court must find the facts

specially and state its conclusions of law separately. The findings and conclusions

may be stated on the record after the close of the evidence or may appear in an

opinion or a memorandum of decision filed by the court." Presenting findings and

conclusions in a written order "has been accepted as the preferable practice" by this Court. *Garlington v. Metro. Life Ins. Co.*, No. 1:11-CV-1260-SCJ, 2012 WL 7589403, at *5 (N.D. Ga. Dec. 31, 2012).

## II.   FINDINGS OF FACT

These findings of fact are based on the evidence contained in the administrative record.

### A. Medical History

Aetna funded a health-insurance plan (the "Plan") issued to "John and Jane Doe" that covered their daughter, "Julie Doe," as a Member.[1] Julie was born in 1999.[2] At a young age, Julie's parents noticed she exhibited defiant and dangerous behavior beyond the level of a normal child.[3] In January 2005, after Julie Doe's parents divorced, she began living with her father and was exposed to certain inappropriate adult information.[4] Shortly thereafter, Julie began to experience

---

[1]   AR 000729. In this Order, the Court refers to some information that the parties have filed under seal. The Court does not find that the information cited in this Order needs to be sealed, notwithstanding the parties' confidentiality designations [ECF 41, at 2 n.2]. *See also BMO Harris Bank, N.A. v. Richert Funding, LLC*, No. 1:15-cv-3886-AT, 2018 WL 6709545, at *2 (N.D. Ga. Jan. 5, 2018).

[2]   AR 000008, 000137.

[3]   AR 000137.

[4]   *Id.*

"serious behavior problems" that required professional counseling and medications.[5]

In 2011, Julie was transferred from private school to public school, where her inappropriate behavior escalated and became sexual in nature.[6] At this time, while in the seventh grade, Julie began to engage in self-harm and self-mutilation, and experienced suicidal ideations.[7] Julie also began experimenting with tobacco, alcohol, and illegal drugs.[8] This led to Julie's hospitalization, enrollment in behavioral therapy, counseling from therapists, and change in medications.[9] From June 2012 to January 2015, with only brief respites, Julie continued this pattern of inappropriate and dangerous behavior, including self-harm, high-risk sexual activity, lying, stealing, and different reactions to medications.[10] During this period, Julie attended two residential treatment programs: Pacific Quest Wilderness Program and Alpine Academy Therapeutic Residency.[11]

---

[5]   *Id.*

[6]   AR 000138.

[7]   *Id.*

[8]   *Id.*

[9]   *Id.*

[10]  AR 000138–39.

[11]  AR 000138, 000337.

In January 2015, after exhibiting slight improvement at the residency programs, Julie returned home and immediately returned to stealing and self-harm.[12] In response, Julie was sent to Brandon Hall, a small boarding school, where she was administered anti-depressants and attended therapy sessions.[13] While at Brandon Hall, Julie engaged in extremely high-risk sexual activities and continued to exhibit inappropriate and dangerous behavior.[14] She was also raped.[15] Based on Julie's dramatic regression, the decision was made to send her back to a structured wilderness treatment program.[16]

After leaving Brandon Hall, from May 2015 until August 2015, Julie attended Trails Carolina, a wilderness treatment facility, and began a medication regimen that included treatments for bipolar disorder and depression.[17] After eleven weeks at Trails Carolina, it was recommended that Julie follow up with a step-down residential treatment facility.[18] Following that recommendation, Julie

---

[12]   AR 000138.

[13]   *Id.*

[14]   AR 000015, 000138.

[15]   *Id.*

[16]   AR 000138.

[17]   AR 000082, 000994.

[18]   AR 000138.

was sent to Solstice East in August 2015.[19] Julie was extremely angry upon intake into Solstice East.[20] She reacted by breaking a glass bottle over her own head to intentionally harm and cut herself.[21] Solstice East diagnosed Julie with unspecified anxiety disorder, family disruption, post-traumatic stress disorder, and major depressive disorder; it immediately increased the dose of her medications.[22] While Julie showed slight improvement at Solstice East, she continued to experience issues with social functioning, inappropriate behavior, and mental stability.[23]

### B.  The Plan

The dispute in this case concerns whether the residential care Julie received at Solstice East was "medically necessary" and therefore covered by the Plan. The Plan defines "medically necessary" as services provided by a health care provider exercising prudent clinical judgment to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms.[24] The provisions of the service must be:

---

[19]   *Id.*

[20]   AR 000015.

[21]   AR 000144.

[22]   AR 000082, 000919.

[23]   AR 000990–95.

[24]   AR 000750.

> (a) In accordance with generally accepted standards of medical practice; (b) Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and (c) Not primarily for the convenience of the patient, physician or other health care provider; (d) And not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury, or disease.[25]

Aetna utilizes a Level of Care Assessment Tool ("LOCAT") as a guideline to "assist in determining whether a level of care is medically necessary."[26] The LOCAT also states that, "[a]s a general guideline, medically necessary services are those services that are appropriate and consistent with the diagnosis in accordance with accepted medical standards," and that the LOCAT "is not a replacement for good clinical judgment, which should be exercised both in connection with applying the LOCAT Guidelines . . . and more broadly in assessing the medical necessity of particular levels of treatment in light of the specific condition for which the Member is seeking treatment."[27]

The LOCAT defines residential care as "under the care of an attending psychiatrist" and a "licensed behavioral health professional . . . must be on-site

---

[25]  *Id.*

[26]  AR 000884.

[27]  *Id.*

and actively on duty 24 hours a day, 7 days a week."[28] On the level of care intensity spectrum, the LOCAT places residential care below "inpatient" and above "partial hospitalization," "intensive outpatient program," and "stabilization."[29] For Aetna to cover behavioral health care, there must be an objective evaluation of the patient's current condition and symptoms indicating a level of severity appropriate to the requested care evidenced by features of one or more of the following admission criteria:

1. **Acute Dangerousness:** Member presents with a level of risk related to harm towards themselves through suicide, self-injury, irritability or mania; or to others through aggression, assaultive, or homicidal behavior.

2. **Functional impairment:** Member presents a temporary and reversible reduction in ability to function such as performing personal hygiene and bodily care activities, obtaining adequate nutrition, sleep, functioning in the work place or at school, or becoming socially isolated.

3. **Mental status changes or co-occurring conditions:** Member presents with disrupted mood, disordered thinking, disorientation, or other mental status changes that need care at the level requested; or there are medical or substance related issues that require care at the level requested.

---

[28]   AR 000886.

[29]   *Id.*

    4. **Psychosocial factors:** The Member's challenges related to stress from family members, non-family members, housing, and work or school that have an impact.

    5. **Additional modifiers:** The Member's history or response to prior treatment, their personal resources such as intellect, characterological issues, and past history of violence or self-harm.[30]

For Aetna to continue covering care after admission, the patient must "continue to require the level of care provided by that facility (that is treatment at a lower, less restrictive level of care is not medically appropriate)."[31] The LOCAT lists six criteria for Aetna to objectively consider in determining whether to continue covering a medical treatment regimen.[32] Moreover, for continued treatment at any level to be covered, "progress must be evident to show that the condition or its symptoms are treatment responsive."[33]

      The Plan also contains a section entitled "EXCLUSIONS AND LIMITATIONS," which Aetna cited in its denial of Plaintiffs' claim for coverage of the care Julie received at Solstice East.[34] This section states that "Non-Medically

---

[30]   AR 000888.

[31]   AR 000889.

[32]   *Id.*

[33]   *Id.*

[34]   AR 000698 (capitalization in original).

Necessary services" are "not Covered Benefits" and include services "[w]hich are not Medically Necessary, as determined by Aetna, for the diagnosis and treatment of illness, injury, restoration of physiological functions, or covered preventive services."[35]

### C. Claim History

On August 13, 2015, Aetna, through its Medical Director Dr. Lawrence Nardozzi, denied Plaintiffs' claim for coverage of Julie's stay at Solstice East.[36] Aetna concluded the treatment was excluded from coverage under the Plan's exception for "non-medically necessary services" because: "The information received does not show that [Julie's] behavior problems are so severe that [she] cannot take care of [herself]. Treatment could be provided at a less intensive level of care or in another setting."[37] In other words, Aetna found that Julie did not meet the "Functional Impairment" LOCAT criteria. Aetna did not refer to any of the other LOCAT criteria in its rejection.

On January 26, 2016, Plaintiffs appealed this denial, arguing Aetna erred by denying coverage based solely on one LOCAT criteria (Functional Impairment)

---

[35]  *Id.*

[36]  AR 000021–25.

[37]  AR 000021.

and not analyzing the other five criteria, any one of which Plaintiffs contend would have supported coverage.[38] Plaintiffs also submitted Julie's updated medical records from August 2015 through January 2016 as part of the appeal.[39]

On March 28, 2016, Aetna denied Plaintiffs' appeal, upholding its determination that residential treatment services were not medically necessary given Julie's condition.[40] Aetna conceded that Julie had a history of defiant and self-destructive behavior, "was resistant in the [Trails Carolina] Wilderness program," and was "struggling with the lack of structure—with impulse control and executive functioning skills."[41] Nonetheless, Aetna denied coverage because, at the precise time of her admission to Solstice East, Julie was not actively suicidal, engaging in dangerous sexual behavior, or suffering from an addiction, and was cooperative with treatment.[42] Aetna nonetheless noted Plaintiffs could request a second-level appeal and that, in doing so, they were allowed to "forward any additional relevant information that [they] would like [Aetna] to consider.[43]

---

[38]   AR 000039–40.

[39]   AR 000049–122.

[40]   AR 000125–30.

[41]   AR 000126.

[42]   *Id*.

[43]   AR 000127.

On May 31, 2016, Plaintiffs submitted their second-level appeal.[44] With their notice of appeal, Plaintiffs included Julie's updated medical records from Solstice East and letters from three of Julie's medical providers (collectively, the "Supplemental Materials").[45] Dr. Theodora Soublis and Dr. Tiffany Sauls, physicians who had personally treated Julie, each submitted letters.[46] The third letter was from Tamara Anconna, an educational counselor who had placed Julie in various care facilities throughout her life.[47] Ms. Anconna's letter explained the nature of the treatment services provided to Julie.[48] All three uniformly agreed that Julie's treatment at Solstice East was medically necessary.[49] Plaintiffs referred to and quoted from the Supplemental Materials in their faxed appeal letter and explained that Aetna would receive hard copies in a forthcoming package.[50]

---

[44] AR 000131–41.

[45] AR 000131–40, 886–997.

[46] AR 000990–91, 997.

[47] AR 000992–95.

[48] *Id.*

[49] AR 000990–97.

[50] AR 000131–40.

Aetna received the Supplemental Materials on June 2, 2016, two days after receipt of the appeal letter.[51] On June 30, 2016, Aetna issued Plaintiffs a final denial letter.[52] While Aetna claimed in its denial letter to have received and reviewed "all available information," its filings in this litigation indicate that it declined to consider most of the Supplemental Materials as "untimely."[53] Curiously, it considered at least *some* of the information contained in the Supplemental Materials. For example, Aetna noted in its final denial letter that Julie's medication dosage had been lowered in March 2016, a fact gleaned exclusively from the Supplemental Materials.[54]

### D. Relevant Procedural History

Following Aetna's final denial, Plaintiffs filed this case pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1132(a)(1)(B). On July 23, 2018, the Court denied Aetna's Motion for Summary Judgment,[55] holding that Aetna:

---

[51]   ECF 36-1, ¶ 81.

[52]   AR 000696–701.

[53]   *Id*. The final denial letter does not state that any of the Supplemental Materials were being excluded as untimely.

[54]   AR 000697.

[55]   ECF 18.

> [C]annot show, as a matter of law, that its decision was
> not arbitrary and capricious. It simply ignored the
> opinions of treating physicians without any explanation,
> and it cherry-picked a fact from "untimely" records it
> contends it did not review.[56]

In denying Aetna's motion, the Court held that all the Supplemental Materials
submitted by Plaintiffs in their second-level appeal were part of the
Administrative Record and "Aetna cannot restrict the Court's review by arbitrarily
choosing to not include documents properly submitted to it. . . . The Documents
at issue here were clearly available to Aetna at the time it reached its final decision,
although it refused to consider them."[57] Moreover, the Court found the
"Defendant's assertion that it did not consider any of the Documents beggars
belief" because Aetna's final decision letter actually relied on some of the
documents it claims not to have considered.[58] The Court held that "[t]he
Documents Aetna refused to consider were of considerable weight and may well
have had a substantial impact."[59] It further determined that Aetna "cannot simply
cherry-pick 'untimely' evidence that supports its conclusion, while ignoring

---

[56]   ECF 41, at 10.

[57]   *Id*. at 6.

[58]   *Id*. at 8.

[59]   *Id*. at 8.

evidence in an admittedly timely appeal request that does not support its conclusion."[60]

However, the Court reserved judgment on the ultimate question of whether Aetna's decision *was* arbitrary and capricious because "Plaintiffs did not move for summary judgment" and "the Court is not called upon to decide" that issue.[61] On December 14, 2018, Plaintiffs filed their Motion for Judgment on the Administrative Record.[62] Aetna cross-moved for Judgment on the Administrative Record on December 17, 2018.[63] Each party opposed the other's motion[64] and filed a reply in support of their own motion.[65]

## III.   CONCLUSIONS OF LAW

### A. The ERISA Framework.

The Plan is governed by ERISA, which sets forth a comprehensive federal scheme for the enforcement of employee benefit plans. 29 U.S.C. § 1001 *et seq.* ERISA permits a person denied benefits under an employee benefit plan to

---

[60]   *Id.* at 8.

[61]   *Id.* at 11.

[62]   ECF 49-1.

[63]   ECF 50.

[64]   ECF 53, 54.

[65]   ECF 59, 62.

challenge that decision in federal district court. *Lesser v. Reliance Standard Life Ins. Co.*, 385 F. Supp. 3d 1356, 1368 (N.D. Ga. 2019) (citing 29 U.S.C. § 1132(a)(1)(B)). "In reviewing the challenged denial, the district court proceeds essentially as an appellate court. . . . The court does not take evidence, but rather evaluates whether the denial was reasonable in light of the record compiled by the plan administrator." *Id*. The Eleventh Circuit has adopted a comprehensive framework for reviewing an administrator's determination:

> 1. Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> 2. If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> 3. If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> 4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). *See also Lesser*, 385 F. Supp. 3d at 1369.

### B. The Supplemental Materials Submitted to Aetna Are Part of the Administrative Record.

Despite the Court's July 23, 2019 Order to the contrary, Aetna reiterates its argument that it properly excluded the Supplemental Materials from the Administrative Record as "untimely" and therefore was justified in ignoring significant portions of those Supplemental Materials.[66] This argument is foreclosed by the Court's prior determination that the Supplemental Materials *are* part of the Administrative Record:

> The Documents at issue here were clearly *available* to Aetna at the time it reached its final decision, although it refused to consider them. Aetna received the

---

[66] ECF 50-1, at 17–18 ("[T]he Supplemental Materials are appropriately not considered part of the Administrative Record as compiled in the claims process because they were not timely submitted to Aetna.").

> supplemental materials on June 2, 2016 and did not reach
> its final decision until June 30, 2016.[67]

This is the law of the case. *United States v. Mack*, 372 F. App'x 33, 34 (11th Cir. 2010)

("Under the law-of-the-case doctrine, a decision of a legal issue establishes the law

of the case and must be followed in all subsequent proceedings in the same case

in the trial court . . . unless (a) the evidence in a subsequent trial is substantially

different; (b) there is a change in controlling law; or (c) the decision was clearly

erroneous.") (internal citations omitted).

Aetna fails to put forward any argument not previously considered by the

Court as to why the Supplemental Materials should be excluded. Aetna admits

that its denial letter did not "explicitly discuss the letters from the three medical

professions [sic]" even though "it appears that Aetna considered at least one of the

submitted items . . . but it is unclear the extent of that review in rendering its

determination." If, as Aetna now posits, it did not consider the Supplemental

Materials because they were untimely, Aetna does not explain why it chose to

credit evidence in the Supplemental Materials that *supported* its position, but

ignore (or at least not address) evidence that *contradicted* its position. Thus,

pursuant to the Court's July 23, 2018 Order and Eleventh Circuit authority, the

---

[67]   ECF 41, at 6–7 (emphasis in original).

Supplemental Materials are part of the Administrative Record and the Court will consider them. *Blankenship*, 644 F.3d at 1354 (holding court's review is based on "the material available to the administrator at the time it made its decision") (*citing Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir.1989)).

### C. Aetna's Benefits Determination Was *De Novo* Wrong.

As the first step, the Court must conduct a *de novo* review of the administrative record to decide whether the plan administrator's benefits determination was "wrong." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (*citing Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir. 2006)). *See also Williams v. BellSouth Telecomms.*, Inc., 373 F.3d 1132, 1138 (11th Cir. 2004) ("[T]he claim administrator's benefits-denial decision is wrong [if] the court disagrees with the administrator's decision.") (internal citations omitted). In determining whether Aetna's decision was "wrong," the Court does not afford any deference to Aetna's decision. *Williams*, 373 F.3d at 1137. The Court must instead "stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." *Stiltz v. Metro. Life Ins. Co.*, No. 1:05-cv-3052, 2006 WL 2534406, at *6 (N.D. Ga. Aug. 30, 2006), *aff'd* 244 F. App'x 260 (11th Cir. 2007). "At this stage, the Court is essentially acting as a fact finder, reviewing the

evidence and making a determination on its own as to whether or not Plaintiff is entitled to [ ] benefits." *Bates v. Metro. Life Ins. Co.*, No. 5:08–CV–22 (CAR), 2009 WL 2355834, at * 10 (M.D. Ga. July 27, 2009).

Normally, in an ERISA case challenging the denial of benefits, "[a] plaintiff suing under this provision bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998). However, "if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." *Id.* (*citing Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)); *Garcon v. United Mut. of Omaha Ins. Co.*, 779 F. App'x 595, 599–600 (11th Cir. 2019) (same).

Aetna did not deny Plaintiffs' claim based on the Plan's "medically necessary" coverage provision; rather, Aetna denied the claim on the basis of the Plan's not-medically necessary policy exclusion.[68] This is demonstrated by Aetna having labeled and quoted the "Medical Exclusions" and "Non-Medically Necessary" portions of the section entitled "Limitation and Exclusions" in denying

---

[68]   ECF 50-1, at 23 ("The Plan expressly excludes coverage for services which are not Medically Necessary, as determined by Aetna.").

Plaintiffs' claim.[69] Thus, for the Court's *de novo* review, the burden is on Aetna to show the coverage exclusion applies. *Garcon*, 779 F. App'x at 599–600; *Horton*, 141 F.3d at 1040. As a practical matter, however, the Court notes it would reach the same decision on its *de novo* review even if the burden were on Plaintiffs.

Plaintiffs argue that Aetna's decision was wrong because the evidence in the Administrative Record demonstrates that "Julie met one or more of the [LOCAT] factors for residential care."[70] Aetna disagrees, arguing its decision was correct because Julie's care at the residential treatment facility was not medically necessary. Accordingly, Aetna contends it was properly excluded from coverage under the Plan: "When analyzed against the LOCAT Guidelines, it is undisputed that [Julie's] reported clinical condition ***at the time of admission and throughout treatment*** as it related to all these factors simply does not meet the requirement for residential treatment."[71] According to Aetna, Julie could have sought a less intensive level of care, or care in another setting, because she "did not meet the level of intensity for residential treatment at the time of her admission."[72]

---

[69]   AR 000698.

[70]   ECF 49-1, at 20.

[71]   ECF 50, at 24 (emphasis in original).

[72]   *Id*. at 13.

In support of its position, Aetna points out that, prior to her admission to Solstice East, "[Julie] did not display any suicidal ideation, homicidal ideation, or psychotic symptoms . . . [she] was not actively violent, manic, psychotic, severely depressed, or otherwise in crisis . . . [t]here is no evidence [Julie] had any significant self-injurious behaviors within a month prior to admission and she had no acute comorbid substance abuse or medical concerns."[73] Aetna also argues Julie did not meet the LOCAT criteria for continued residential treatment because she was medically compliant and her condition gradually improved while at Solstice East.[74]

On this *de novo* review of the Administrative Record, the Court concludes that Aetna's decision was wrong for two reasons: (1) Julie's condition satisfied multiple categories of the LOCAT guidelines sufficient to warrant residential treatment; and (2) "good clinical judgment" supported Julie needing residential treatment following her stay at Trails Carolina. Most significantly, Julie's treating physicians and counselor uniformly found Julie's stay in residential care was medically necessary.

---

[73] *Id*. at 13, 25–26.

[74] *Id*. at 14–15.

### i.    Application of the LOCAT Factors Indicates that Julie's Residential Treatment Was Medically Necessary.

In denying Plaintiffs' claim, Aetna found Julie's condition "***at the time of admission and throughout treatment***" at Solstice East did not support a residential treatment regime.[75] Aetna's extraordinarily narrow view of Julie's medical condition, focusing on the precise moment Julie was admitted and ignoring previous years of documented trauma, self-harm, and destructive behavior, belies the record. It is true that, "[f]or the purposes of the LOCAT, the time frame being considered is that of *this presentation of the illness*."[76] However, this mandate does not exist in isolation, as the very next sentence states that "the Aetna clinician may take into account *historical* and *demographic* features into this assessment."[77] In fact, the LOCAT states the components that may go into Aetna's coverage decision include: (1) "[p]ast clinical history (medical and psychiatric, including response to medication)"; (2) an "[a]ssessment of the current support system available to the patient"; (3) the patient's "[f]amily history"; (4) the patient's "[c]urrent medical status"; and (5) a "[c]omprehensive risk assessment, including consideration

---

75   ECF 50-1, at 24 (emphasis in original).

76   AR 000887 (emphasis in original).

77   AR 000887–88 (emphasis added).

of . . . comorbid substance use, medical conditions, support system, and other factors."[78]

Aetna does not deny that Julie experienced severe, documented trauma.[79] However, Aetna's application of, at best, two articulated LOCAT factors to Julie's condition at the *precise* moment she was admitted to Solstice East defies the LOCAT's terms. Contrary to Aetna's determination, Julie exhibited many of the symptoms outlined for residential care in each of the LOCAT sub-sections before, during, and after her admission to Solstice East.

*First*, Julie's behavior met the LOCAT criteria of "Acute Dangerousness" required for residential treatment because she demonstrated "impaired judgment to the extent that serious harm or death may result."[80] While at Brandon Hall, under the precise type of lesser intensive-care level advocated for by Aetna, Julie exhibited volatile and self-destructive behavior. This included hyper-sexual addiction, self-harm, self-mutilation, and suicidal ideations.[81] After leaving

---

[78]   AR 000888.

[79]   *See, e.g.*, AR 000697 ("The patient has a history of doing residential treatment facility and wilderness programs. She has had extensive treatment in the past. . . . Prior to attending [Solstice East], the patient has engaged in hypersexual behaviors with other individuals.").

[80]   AR 000891.

[81]   AR 000990–97.

Brandon Hall, Plaintiffs presented Aetna with evidence that Julie may have engaged in self-harm while at the next facility, Trails Carolina.[82] And, on admission to Solstice East, Aetna admits Julie was extremely emotional and angry.[83] In fact, Julie reacted by breaking a glass bottle over her own head to intentionally harm and cut herself.[84]

Dr. Sauls further demonstrates Julie's need for residential care. She wrote that Julie was referred to Solstice East "for further treatment of risky behaviors, mood dysregulation and passive suicidality."[85] According to Dr. Sauls:

> Residential treatment was medically necessary for [Julie] due to her previous failure of treatment at both residential and a lower level of care. . . . While engaged in Solstice East [residential treatment care's] structured setting, [Julie] continues to struggle with mood dysregulation and impulsive behaviors. She has benefited from intensive individual, family and group therapies and therapeutic support in the milieu. . . . As the primary physician responsible for this patient's care, it is my opinion that long-term residential care was/is necessary to provide the platform for significant gains in mental health stability, and to prevent serious harm to the patient, in the form of continued physiological distress, self-harm, or suicide. [Julie] was at high risk of deterioration after discharge from Trails Carolina, with

---

[82]   AR 000697.

[83]   AR 000015.

[84]   AR 000144.

[85]   AR 000997.

high risk for worsening depression or self-harm, if not
for continued treatment in a residential setting.[86]

Ms. Anconna and Dr. Soublis independently concurred that Julie's
proclivity for self-harm required a higher level of care than what she received at
Brandon Hall.[87] According to Ms. Anconna: "Any treatment intervention besides
residential would have placed [Julie] again in the highest risk category for
continued disruptive failures, self-destruction and sexual promiscuity that could
have drastically altered the course of [Julie's] life."[88] Dr. Soublis likewise stated
that "[g]iven the amount of treatment [Julie] had received previously and the
behaviors she was exhibiting, she required a higher level of care than what
outpatient individual and family therapy could provide for her."[89]

Aetna does not dispute the validity or seriousness of Julie's prior history of
self-harm or suicidal ideations. Nonetheless, Aetna argues its denial of benefits
was proper because Julie was not actively suicidal or violent "[j]ust prior to
admission" to Solstice East.[90] This exceedingly narrow view of Julie's condition is

---

[86]   *Id.*

[87]   AR 000992–97.

[88]   AR 000994.

[89]   AR 000991.

[90]   AR 000697.

contrary to an objective application of the LOCAT criteria to the record. While Julie's condition may have marginally improved at Trails Carolina, her medical records and letters from physicians and counselors show her eleven-week stay did not abate her mental illness nor reverse the clock on seventeen years of trauma.

*Second*, Julie's behavior met the LOCAT criterion of "Functional Impairment" required for residential treatment because she demonstrated the "total or almost total withdrawal from all situations, including social and occupational/educational," inability to care for herself, "[n]ear complete disruption of relationships," inability to "work/attend school due to mental illness," and "inability to obtain basic needs."[91] Julie could not attend school at Brandon Hall because her mental illness caused severe sexual acting-out and mental trauma. This did not drastically change after she left Trails Carolina and was admitted to Solstice East, as Julie continued to demonstrate the inability to function as an adult. At 17 years-old, Julie wet the bed twice in a week's span.[92] She remained "socially isolated" and unable to function in a social situation.[93] Julie was "observed to have a vacant expression on her face and refuses or avoids to

---

[91]   AR 000983.

[92]   *Id*.

[93]   *Id*.

check in about where she is at authentically."[94] She struggled to maintain engaged during an entire day and her reading time was limited to 15 minutes before bedtime.[95] This led her to be unable to maintain relationships with her parents and peers.[96] Julie also often acted disrespectfully, aggressively, or impulsively.[97] Aetna does not dispute these facts or explain their relation to the LOCAT criteria.

*Third*, Julie's behavior met the LOCAT criterion of "Mental Status Changes" required for residential treatment because she exhibited "severe mood lability."[98] Julie's medical records from Solstice East state that she maintained a "[d]epressed mood most of the day, nearly every day, as indicated by either subjective report (e.g. feels sad, empty hopeless . . . markedly diminished interest or pleasure in all, or almost all, activities most of the day)."[99] Julie harbored "feelings of worthlessness or excessive or inappropriate guilt."[100] This caused her to have the "[d]iminished ability to think or concentrate" and to have "impairment in social,

---

[94]   AR 000933.

[95]   AR 000972.

[96]   AR 000971.

[97]   AR 000929, 962, 973.

[98]   AR 000895.

[99]   AR 000971.

[100]   *Id.*

occupational, or other important areas of functioning."[101] Although Aetna relied on certain portions of Julie's Solstice East medical records, it does not cite to or discuss these particular facts.

*Fourth*, Julie's behavior met the LOCAT criterion of "Psychosocial Factors" required for residential treatment because**,** as stated above, her "challenges related to stress from family members, non-family members, housing, and work or school" are amply demonstrated by the Administrative Record.[102]

*Finally*, Julie's behavior met the LOCAT criterion of "Additional Modifier" required for residential treatment because Julie's "history or response to prior treatment" and "past history of violence or self-harm" is well documented in the record. The explanatory paragraph for the "Additional Modifier" category in the Plan further demonstrates Aetna's decision was wrong:

> Aetna plans cover acute, treatable psychiatric illnesses that would be expected to improve in a given level of care. As indicated in the introduction to LOCAT, that treatment is in the least restrictive setting. However, the Member's history of responses to prior treatment, their personal resources such as intellect, or underlying characterological issues, and past history of violence or

---

[101] *Id*.

[102] *See, e.g.*, AR 000696 (stating Julie had problems "relating to family members, problems connecting to her siblings and parents"). *See also supra* at 2–5.

> self-harm may influence the decision about which care is
> medically necessary.[103]

Aetna does not dispute Julie's troublesome history with prior medical treatment
(including her difficult experiences at Brandon Hall—the exact level of care Aetna
believes was appropriate), use of alcohol and drugs at an extremely young age,
self-harm, self-mutilation, and suicidal tendencies. While Julie's condition may
have slightly improved during the eleven weeks at Trails Carolina, her treating
physicians and counselors uniformly warned Julie's condition would regress, and
potentially turn to full addiction or death, without treatment at a residential care
facility.[104]

Aetna does point to Julie's two overnight stays at her home (one in
December 2015 and the other in March 2016) as indicia that her residential
treatment was not medically necessary.[105] Irrespective of whether the stays were
successful, the Court declines to afford much weight to two overnight home visits
during a four-month span in light of the significant evidence that residential
treatment was medically necessary.

---

[103]   AR 000896.

[104]   AR 000991–97; *supra* at 24–26.

[105]   AR 000697.

The LOCAT provides that only one of five "Global Indicators" must be met for coverage to be appropriate.[106] The Court must consider all of the following:

> (1) Patient presents at least one valid DSM-5 diagnosis not excluded by the plan, and (2) Patient's condition must be directly attributable to the designed mental disorder and not to an antisocial personality or be a part of a pervasive pattern of antisocial conduct, and (3) Professional intervention is considered likely to be effective and is essential to contain risks presented and provide for improvement, and (4) The intensity of services being provided conforms with the standards of the levels of care as defined by Aetna, and (5) Treatment at a lower level of care is not possible because the individual requires the requested level of observation and/or treatment.[107]

The Courts finds Julie's condition arguably meets all five conditions, but at the very least the second, third, and fifth Global Indicators. The Court concludes that an objective analysis of the LOCAT factors in relation to the entire Administrative Record necessitates a finding that Aetna's decision to deny coverage was wrong.

### ii. "Good Clinical Judgment" Indicates Julie Required Residential Treatment After Her Stay at Trails Carolina.

Beyond a rigid analysis of the LOCAT factors, Aetna's decision is wrong because, by its very terms, the LOCAT is "a general guideline" and "not a

---

[106] AR 000897–98.

[107] *Id.*

replacement for good clinical judgment, which should be exercised both in connection with applying the LOCAT Guidelines . . . and more broadly in assessing the medical necessity of particular levels of treatment in light of the specific condition for which the Member is seeking treatment."[108] As stated above, Aetna's denial of benefits seemingly rests on the assumption that Julie's eleven weeks at Trails Carolina drastically improved her condition and negated her severe documented illness. Aetna does not discuss the "good clinical judgment" standard or provide an independent medical review in its denials.

Conversely, Julie's two treating physicians and counselor uniformly agreed that her residential treatment was clinically necessary to prevent further life-altering harm.[109] While the Court is not required to afford special weight to these statements,[110] the *only* opinions of practicing medical professionals in the Administrative Record indicate that "good clinical judgment" warranted Julie's stay in residential care. This qualifies as weighty evidence beyond a strict application of the LOCAT factors. Aetna's lack of discussion of the "good clinical judgment" standard exemplifies the incorrect nature of its decision.

---

[108]   AR 000884.

[109]   AR 000990–97.

[110]   *Infra* at 33–34.

### iii.  Julie's Treating Physicians and Counselor Uniformly Found Julie's Stay in Residential Care Was Medically Necessary.

Aetna's decision to ignore (or at least not address) the three letters from Julie's treating physicians and counselor further demonstrates the incorrect nature of its decision. Aetna glaringly does not confront, or seek to explain away, these professionals' uniform opinion supporting residential care. Aetna also does not address the evidence in Julie's updated medical records that show she was still struggling with numerous issues at the time she was admitted to Solstice East and thereafter. Instead, Aetna cherry-picks lines from her medical records—including the "untimely" Supplemental Materials—to weave together an argument that Julie's condition so vastly improved after eleven weeks that she could return back to the same level of care provided at Brandon Hall, where she exhibited some of her most extreme and dangerous behavior to date. The arguments pressed by Aetna are patently unpersuasive.[111]

---

[111] Aetna's argument regarding Julie's history with residential care is contradictory and unconvincing. Aetna justified its denial of Plaintiffs' claim for Julie's immediate residential care because she "had ample treatment opportunities in residential settings without much improvement." [AR 000679.] However, Aetna then justified its denial of ongoing coverage of Julie's stay at Solstice East because her condition had allegedly improved to the point where residential treatment was not medically necessary.

While not a requirement, Aetna could have performed an independent examination of Julie, but did not.[112] Instead, Aetna's final denial letter relied on the opinion of Dr. Monika Roots, who reviewed Julie's file.[113] Dr. Roots noted Julie's history with failed treatment, self-mutilation, suicidal tendencies, and self-injurious behaviors merely eleven weeks prior to admission at Solstice East, and her extreme emotional reaction at the time of admission.[114] Despite this evidence, Dr. Roots found that "[j]ust prior to admission," Julie did not have suicidal ideations and her medication had been decreased while at Solstice East.[115]

Conversely, while the Court is also not required to "automatically [ ] accord special weight to the opinions of a [treating] physician,"[116] the Court may "take into account [Julie's] longstanding relationship with these providers and their substantial agreement with one another regarding [Julie's] condition and concomitant limitations. *Lesser*, 385 F. Supp. 3d at 1371. "There can be no serious doubt that a psychiatric opinion of a treating psychiatrist is more reliable than an opinion based on a one-time file review." *Kinser v. Plans Admin. Comm. of Citigroup,*

---

[112]   ECF 53-1, at 5–6.

[113]   AR 000144–45, 155.

[114]   AR 000144.

[115]   *Id.*

[116]   *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

*Inc.*, 488 F. Supp. 2d 1369, 1383 (M.D. Ga. 2007). This is especially true here, as in *Lesser*, where "the opinions of the [patient's] treating physicians are corroborated by objective medical evidence." *Id.*

Therefore, following an objective, independent consideration of the record in its entirety, the Court concludes that Aetna's decision to deny Plaintiffs' coverage under the Policy was *de novo* wrong.

### D. Aetna Was Vested with Discretion Under the Plan to Review and Determine Eligibility Decisions.

Since Aetna's decision was wrong, the Court must next determine if the Plan grants Aetna discretion, as the claims administrator, to make benefit determinations. Section 9.6 of the Plan states:

> Claim Determinations. [Aetna has] complete authority to review all claims for Covered Benefits under this Group Agreement. In exercising such responsibility, [Aetna] shall have discretionary authority to determine whether and to what extent eligible individuals and beneficiaries are entitled to coverage and to construe any disputed or doubtful terms under this Group Agreement, the Certificate or any other document incorporated herein. [Aetna] shall be deemed to have properly exercised such authority unless [Aetna] abuse[s] [its] discretion by acting arbitrarily and capriciously.[117]

---

[117]   AR 000712 (emphasis omitted).

Even though the Court has determined that Aetna's decision was *de novo* wrong, it must nevertheless uphold the determination unless it was arbitrary, capricious, and unreasonable. *Jett*, 890 F.2d at 1140.

### E. Aetna's Benefits Determination Was Arbitrary and Capricious, and No Reasonable Grounds Support Its Decision.

#### i. Standard of Review

When conducting a review of an ERISA benefits denial under the arbitrary and capricious standard, the Court's function is to determine "whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Graham*, 222 F. Supp. 3d at 1137–38 (*citing Jett*, 890 F.2d at 1139). The Court limits its review to whether Aetna's benefits determination "was made rationally and in good faith—not whether it was right." *Griffis v. Delta Family–Care Disability*, 723 F.2d 822, 825 (11th Cir. 1984). "The reviewing court will affirm merely if the administrator's decision is reasonable given the available evidence, even though the reviewing court might not have made the same decision if it had been the original decision-maker." *Burden v. Reliastar Life Ins. Co.*, No. 1:12–CV–04392–WSD, 2014 WL 26090, at *5 (N.D. Ga. Jan. 2, 2014) (alterations omitted) (*quoting Callough v. E.I. du Pont de Nemours & Co.*, 941 F. Supp. 1223, 1228 n.3 (N.D. Ga. 1996)).

At this stage, since Aetna operated under a conflict of interest under Eleventh Circuit law,[118] Plaintiffs bear the ultimate burden of showing Aetna's denial was arbitrary, capricious, and unreasonable. *Ferrizzi v. Reliance Standard Life Ins. Co.*, No. 18-11803, 2019 WL 5813992, at *6 (11th Cir. Nov. 7, 2019) (where "there is a conflict of interest, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.") (*citing Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1360 (11th Cir. 2008)).

### ii.    Conflict of Interest

A "reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, [but] the burden remains on the plaintiff to show the decision was arbitrary." *Graham v. Life Ins. Co. of N. Am.*, 222 F. Supp. 3d 1129, 1138 (N.D. Ga. 2016); *Doyle*, 542 F.3d at 1360. As a matter of undisputed Eleventh Circuit law, a "conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Blankenship*, 644 F.3d at 1355 (*citing Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)). The effect of a conflict

---

[118] *Infra* at 37–41.

of interest varies "according to the severity of the conflict and the nature of the case: we look to the conflict's 'inherent or case-specific importance.'" *Id.* (*citing Glenn*, 554 U.S. at 111). Thus, "[e]ven where a conflict of interest exists, courts still owe deference to the plan administrator's discretionary decision-making as a whole." *Id.* (*citing Doyle*, 542 F.3d at 1363).

While Aetna argues it "did not operate under a conflict of interest," it nonetheless admits "Aetna both determines eligibility for benefits, as administrator of the Plan, as well as pays the benefits due under the plan."[119] Therefore, under *Blankenship*, Aetna operated under a structural conflict of interest.[120] Aetna's argument is properly framed as a challenge to the *weight* of Aetna's conflict of interest—not its *existence*. Thus, the Court will, as it must, take Aetna's administrative conflict into account as a factor in determining whether Aetna's denial-of-benefits determination was arbitrary and capricious. *Doyle*, 542 F.3d at 1360.

---

[119]   ECF 50-1, at 29–30.

[120]   *Id.* (*quoting Blankenship*, 644 F.3d at 1355).

### *iii.* **Discussion**

In its July 23, 2019 Order, the Court held Aetna "cannot show, as a matter of law, that its decision was not arbitrary and capricious."[121] Since Plaintiffs did not cross-move for summary judgment, the Court did not reach the ultimate issue of whether Aetna's decision *was* arbitrary and capricious. With this issue now properly before the Court, it is clear Aetna's decision was, in fact, arbitrary and capricious.

Aetna's final denial letter relied exclusively on Dr. Roots' review of Julie's medical file and essentially ignored the opinions of Julie's treating medical professionals—Dr. Sauls, Dr. Soublis, and Ms. Anconna. While Aetna was not required to afford these opinions special weight, it could not arbitrarily ignore them either. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). *See also Kinser v. Plans Admin. Comm. of Citigroup, Inc.*, 488 F. Supp. 2d 1369, 1383 (M.D. Ga. 2007) ("Such a selective review of the evidence and reliance on a cold record file review by a non-examining doctor establishes that MetLife's decision was not made rationally and in good faith and is therefore unreasonable.") (*citing Griffis v. Delta Family–Care Disability Plan*, 723 F.2d 822, 825 (11th Cir. 1984)).

---

[121]   ECF 41, at 10.

Aetna's regurgitated argument that it properly excluded the Supplemental Materials from its review because they were "untimely" is a non-starter. This evidence was certainly part of the "facts known to the administrator at the time the decision was made" and was therefore proper for the Plan administrator to consider. *Jett*, 890 F.2d at 1139. This alone is enough to find Aetna's decision arbitrary and capricious. Moreover, Aetna's "untimely" argument is belied by the fact that it *does* rely on Julie's March 2016 medical records from Solstice East to deny Plaintiffs' claim. That information was submitted as part of the Supplemental Materials *at the same time* as the evidence Aetna declined to consider on untimeliness grounds. It appears that Aetna simply cherry-picked a fact that *supported* its position and ignored the medical records and opinions of medical professionals that *countered* its position. Aetna offers no justification for its inconsistent conduct. In fact, counsel for Aetna were placed in the unenviable position of being unable to honestly articulate what evidence Aetna did or did not consider in its final denial.[122] Counsel did the best they could on behalf of their

---

[122]  ECF 50-1, at 33 ("As an initial matter, although the Final Denial Letter does not explicitly discuss the letters from the three medical professions [sic], it appears that Aetna considered at least one of the submitted items based on the reference to medical records included in the Supplemental Materials, but it is unclear the extent of that review in rendering its determination.").

client with the record before them. But this Court has held such conduct is arbitrary and capricious. *Lesser*, 385 F. Supp. 3d at 1376 ("Both during its initial review process and on appeal, the Defendant selectively read and misinterpreted the medical evidence in the record to support its position. . . . [P]lan administrators are not free to rely on selective or self-serving interpretations of the medical evidence that are not supported by the record."). *See also Acree*, 917 F. Supp. 2d at 1319 (M.D. Ga. 2013) ("When a plan fiduciary relies on inconclusive, unreliable evidence, and ignores contrary evidence, the resulting decision is arbitrary and capricious.") (*citing Burnett v. AIG Life Ins. Co.*, No. 6:08-CV-322-HAI, 2011 WL 1226867, at *12 (E.D. Ky. Mar. 30, 2011)).

Finally, Aetna's structural conflict of interest, although only one factor in the analysis, reinforces the view that Aetna had a results-oriented approach towards its medical necessity determination. *See Rosen v. Provident Life & Accident Ins. Co.*, No. CIV. A. 02-591, 2003 WL 22254805, at *10 (E.D. Pa. Sept. 30, 2003) ("Defendant's decision to deny benefits was arbitrary and capricious. . . . [Defendant's] demonstrated lack of objectivity . . . dictate[s] that the decision cannot withstand judicial scrutiny. Defendant [ ] selectively relied on evidence favoring a denial of benefits, inadequately discounted evidence to the contrary,

and ignored substantial evidence that would support a finding of disability under the plan documents.").

Accordingly, the Court finds that Aetna's decision was arbitrary and capricious, and that no reasonable grounds supported its position.

### F.  The Appropriate Remedy.

Having determined that Aetna's adverse benefits determination was arbitrary and capricious, the Court must decide the appropriate remedy. "[A]s a general rule, remand to the plan fiduciary is the appropriate remedy when the plan administrator has not had an opportunity to consider evidence on an issue." *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1330 (11th Cir. 2001) (*citing Jett*, 890 F.2d at 1140)). *See also Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997) ("Should [the beneficiary] wish to present additional information that might affect the determination of eligibility for benefits, the proper course would be to remand to [the plan administrator] for a new determination.").

However, the Eleventh Circuit in *Levinson* also stated that: "We do not agree, however, that a remand to the plan administrator is appropriate in every case, nor do we agree that our own precedent dictates that remand is appropriate in every case." *Id.* (*citing Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 n.6 (4th Cir. 1993) (internal citations omitted)). *See also Billings v. UNUM Life Ins. Co. of*

*Am.*, 459 F.3d 1088, 1096 (11th Cir. 2006) (affirming decision in *Levinson* to award benefits instead of remanding to plan administrator).

Remand is particularly inappropriate when "the record is complete and neither party has put forward evidence that was unavailable to the Defendant at the time that it made its benefits determination." *Lesser*, 385 F. Supp. 3d at 1379. *See also Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001) ("[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts."); *Smith v. Cont'l Cas. Co.*, 616 F. Supp. 2d 1286, 1306 (N.D. Ga. 2007) ("Remand is not appropriate where the wrongful decision to deny benefits was made on a complete administrative record, and the Court can find on the record before it that the claimant is [entitled to benefits]. . . . Remand is also inappropriate where the plan administrator's course of conduct contains such serious procedural irregularities that the insured is forced to argue a case to a Board that lacked the requisite objectivity.").

The Court agrees with Plaintiffs that remand is not appropriate in this case. Instead, an award of benefits is the proper remedy.[123] The administrative record is complete and neither party has put forward any evidence that was not available

---

[123]  ECF 53-1, at 10.

to Aetna when it made its benefits determination, even if Aetna chose to ignore it. *Lesser*, 385 F. Supp. 3d at 1379. Contrary to Aetna's representations, it had ample opportunity to consider the Supplemental Materials in full before denying Plaintiffs' claim. Based on the Administrative Record, it is appropriate for the Court to find that Plaintiffs are entitled to benefits.

## IV.   CONCLUSION

Plaintiffs' Motion for Judgment on the Administrative Record [ECF 49] is **GRANTED** and Aetna's Motion for Judgment on the Administrative Record [ECF 50] is **DENIED**.

Since the issue of an appropriate amount of damages—including the total cost of Julie's treatment, attorney's fees, and/or prejudgment interest[124]—have not yet been considered, the Court orders Plaintiffs to submit a motion, with accompanying affidavits and all supporting evidence, articulating their requested damages award within 21 days of this Order. The motion should be accompanied by a proposed final judgment order detailing, in specific dollar amounts, the

---

[124] The Court may award attorney's fees and/or prejudgment interest at its discretion. *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1484 (11th Cir. 1995) ("The award of an amount of prejudgment interest in an ERISA case is a matter committed to the sound discretion of the trial court."). The Court has not yet made a determination of whether Plaintiffs are entitled to attorney's fees and/or prejudgment interest.

award Plaintiffs believe they are owed under the Plan. Aetna may respond within 14 days after the filing of Plaintiffs' motion. None of the briefs should exceed 10 pages in length. In lieu of filing a reply, the Court may, in its discretion, conduct an evidentiary hearing and oral argument to determine the proper benefits award.

**SO ORDERED** this the 27th day of January 2020.

Steven D. Grimberg
United States District Court Judge